UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA, | 3:23-CR-30061-RAL |
|---|---|
| Plaintiff, | |
| vs. | OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS |
| ETHAN SCHNITKER, | |
| Defendant. | |

Defendant Ethan Schnitker is charged with sexual abuse, abusive sexual contact, and child abuse. Doc. 1. Schnitker filed a motion to suppress certain statements made to child protection specialist Brooke Noska ("Noska") and FBI Special Agent Glenn Moule ("SA Moule") on October 19, 2021, and made to SA Moule on February 4, 2022. Doc. 19. Magistrate Judge Mark A. Moreno held a hearing on Schnitker's Motion to Suppress, Doc. 19, on October 11, 2023, and thereafter issued a Report and Recommendation for denial of the motion, Doc. 43. Schnitker objected to the Report and Recommendation, Doc. 45, and supplemented his motion to suppress, Doc. 44, seeking to suppress buccal swabs and statements from February 4, 2022. Judge Moreno held a hearing on the supplement on November 17, 2023, and thereafter issued a Report and Recommendation for denial of the motion, Doc. 49, to which Schnitker objected, Doc. 55.

This Court reviews a report and recommendation under the statutory standards of 28 U.S.C. § 636(b)(1), which states that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

1

objection is made." After a de novo review of the evidence, this Court overrules Schnitker's objections, Doc. 45, 55, adopts Magistrate Judge Moreno's Reports and Recommendations, Docs. 43, 49, and denies Schnitker's Motion to Suppress, Doc. 19, and Supplement to Motion to Suppress, Doc. 44.

I. **Facts Relevant to Motion to Suppress**

Schnitker and his wife were in the process of becoming foster parents when Blue Earth County Human Services received an allegation of sexual abuse against Schnitker. ST at 10–11.[1] As part of the investigation into the allegation, child protection investigator Noska was in contact with local law enforcement and the FBI to coordinate an interview with Schnitker, which was scheduled for October 19, 2021. Id. at 13–14. Noska and SA Moule conducted the interview. Id. at 20. Schnitker came to the interview of his own accord, was told the interview related to allegations from the alleged victim, id. at 22, seemed of average intelligence, id. at 23–24, and answered questions appropriately, id. at 22. The interview occurred at the Blue Earth County Government Center. Id. at 14. The interview room was never locked, and Schnitker was free to leave, id. at 17, 23; at one point during the interview, he exited the interview room to use the restroom and came back on his own, id. at 23. Schnitker sat approximately five feet away from Noska and SA Moule. Id. at 21. SA Moule identified himself as working with the FBI, was in casual clothing, and had his firearm concealed. Id. at 44.

Noska conducted the first portion of the interview, telling Schnitker what allegations had been made and her role in the investigation, id. at 19, 22; Ex. 1a at 2, and SA Moule conducted the latter part, ST at 24, 48–49; see also Ex. 1a at 35. The entire interview lasted around seventy-five

---

[1] The transcript from the October 11, 2023 suppression hearing will be cited as "ST." Exhibits from the October 11, 2023 suppression hearing will be cited as "Ex."

2

minutes. See Ex. 1a. During the interview, Schnitker made various comments directly responding to the allegations, including that he did not have sex with the alleged victim and that his DNA could have ended up on her clothing from shared laundry facilities. Ex. 1a at 33, 58–59, 82. Schnitker asked about his situation, and SA Moule responded that Schnitker was "not in criminal trouble." ST at 69–71; Ex. 1a at 77–78. Schnitker disputes knowing the interview was part of a criminal investigation, ST at 48, 68, but Schnitker at one point commented about how he expected to be in handcuffs, id. at 68. Near the end of the interview, SA Moule asked Schnitker for buccal swabs for DNA testing. Id. at 50; Ex. 1a at 69–70. Before giving the buccal swabs, Schnitker asked if he needed to get an attorney; SA Moule responded that he could not give legal advice but clarified that Schnitker's participation was voluntary and that he could refuse. ST at 50; Ex. 1a at 75. Schnitker agreed to the buccal swabs and indicated a further willingness to take a polygraph test at a future date. ST at 50; Ex. 1a at 59, 75–76.

On February 4, 2022, SA Moule organized for Schnitker to take a polygraph and conducted a second interview of Schnitker at SA Moule's office in Mankato. ST at 51. Schnitker arrived on his own volition. Id. at 53. The interview lasted approximately fifteen minutes and occurred in an interview room. Id. at 54–55. The door had a lock but remained unlocked and open the entire interview, and Schnitker sat closest to the door. Id. SA Moule sat approximately three feet away from Schnitker on the opposite side of a round table; he was in casual clothes and armed. Id. at 54–56. SA Moule confronted Schnitker about his DNA taken from the buccal swabs matching DNA found in the alleged victim's underwear and explained they "need to talk about that." Id. at 55, 66, 70; Ex. 2a at 7. Schnitker repeatedly denied having had sex with the alleged victim and suggested she may have "had some sort of master plan" to obtain his semen from a condom he used with his wife and put it in her own underwear. ST at 63; Ex. 2a at 7–9. Upon hearing of the

3

match between his DNA and the semen found in the alleged victim's underwear, Schnitker asked about an arrest. Ex. 2a at 14. SA Moule, who had not intended to arrest Schnitker at that time, explained that Schnitker was not currently under arrest and that he was there voluntarily. ST at 57, 64–65; Ex. 2a at 14–16. Schnitker responded "yes," to SA Moule's comment about being at the interview voluntarily before asking about whether he should get an attorney. Ex. 2a at 15. SA Moule explained that he "can't give [Schnitker] any legal advice," and that the case agent in Pierre would make any decisions about arresting Schnitker at a later date. Id. at 15–16.

Schnitker moves to suppress his October 2021 statements to Noska and SA Moule on voluntariness grounds. He also moves to exclude the buccal swabs from that day and any subsequent DNA testing from the buccal swabs as involuntary or as fruits of an alleged Fourth Amendment violation. Lastly, he moves to exclude his statements to SA Moule from the February 2022 interview on voluntariness grounds and as fruit of alleged Fourth Amendment violations from the October 2021 interview.

## II. Discussion

### A. Voluntariness of Defendant's Statements

Schnitker challenges the Report and Recommendation's finding that his statements during the first interview were voluntary. Schnitker supports this position by citing to his question about needing an attorney, lack of awareness of a criminal investigation, lack of Miranda warnings, and the comments about him not being in criminal trouble. Based on the circumstances of this case and Eighth Circuit precedent, this Court concludes that Schnitker's will was not overborne and his statements were voluntary.

Involuntary statements made in violation of the Fifth Amendment are subject to exclusion from evidence. See United States v. Carroll, 207 F.3d 465, 472 (8th Cir. 2000). "A statement is

4

involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (citation omitted). "We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." United States v. Brave Heart, 397 F.3d 1035, 1040 (8th Cir. 2005) (citations omitted). "The mere fact that an officer may have elicited a confession through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." United States v. Boslau, 632 F.3d 422, 428–29 (8th Cir. 2011) (cleaned up and citation omitted); see also United States v. Aldridge, 664 F.3d 705, 713 (8th Cir. 2011) (determining that police-dominated atmosphere and use of deceptive interview tactics was "not enough" to show that the defendant's statement was involuntary).

No evidence exists to suggest that Schnitker's will was overborne in either interview. The conversational tone of the interviews, ST at 47; SA Moule's casual attire, id. at 56; the remarks that Schnitker was not going to be immediately arrested, Ex. 1a at 65, Ex. 2a at 15; comments that Schnitker's participation in the interviews and buccal swabbing was voluntary, Ex. 1a at 75, Ex. 2a at 15; Schnitker's acknowledgment of that voluntariness, Ex. 1a at 75, Ex. 2a at 15; and his willingness to speak to Noska and SA Moule, see Ex. 1a at 75, Ex. 2a at 15, belie that law enforcement "exert[ed] pressure to confess on" Schnitker, Brave Heart, 397 F.3d at 1040. Rather,

5

SA Moule allowed Schnitker to make his own decisions without "threats, violence, or express or implied promises." LeBrun, 363 F.3d at 724.

The record fails to support that Schnitker was particularly susceptible to police pressure. Schnitker's age, Ex. 1a at 12; ability to appropriately answer interview questions, ST at 22, 46, 55; ability to theorize alternative explanations for the presence of his semen on the alleged victim's underwear, Ex. 1a at 82, Ex. 2a at 7–9; prior criminal record, Ex. 2a at 72; questions about whether he should get an attorney, Ex. 1a at 15, Ex. 2a at 75; and comments about whether he would be arrested, Ex. 1a at 14–15, Ex. 2a at 63–65, all suggest a lack of susceptibility to having his will overborne. These facts instead indicate that he was of a clear head, could generally understand the purpose of the interviews, and recognized the potential for being implicated in a criminal matter—even though SA Moule did not initially tell Schnitker that he was under investigation and implied that he was not in criminal trouble. The failure of SA Moule to warn Schnitker of the consequences of participating in the interviews and answering questions does not somehow convert the interviews from conversational, consensual interactions into ones where Schnitker could no longer make his own decisions freely. Therefore, under a Fifth Amendment voluntariness analysis, the conditions and atmosphere of the interviews did not overbear Schnitker's will or "critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724 (citation omitted).

Another prophylactic component of a voluntariness analysis, which is only relevant when an individual is under arrest or in any other custodial interrogation, is whether the interrogating state actor complies with Miranda v. Arizona, 384 U.S. 436, 444 (1966). "The familiar Miranda rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." United States v. Armstrong, 39 F.4th 1053, 1056 (8th Cir. 2022); see also United States v. Tapia-Rodriguez, 968 F.3d 891, 894 (8th Cir. 2020) (indicating a

defendant's statements must be "the product of 'custodial interrogation'" to be inadmissible under Miranda (quoting Miranda, 384 U.S. at 444)). "The critical inquiry in determining whether a person is in 'custody' for purposes of Miranda is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Treanton, 57 F.4th 638, 641 (8th Cir. 2023) (quoting United States v. Simpson, 44 F.4th 1093, 1096 (8th Cir. 2022)). One consideration includes "the circumstances surrounding the questioning and whether, given those circumstances, a reasonable person would have felt free to terminate the questioning and leave." United States v. Ferguson, 970 F.3d 895, 901 (8th Cir. 2020).

Courts examine "the extent of the physical or psychological restraints placed on the suspect during interrogation." United States v. Laws, 819 F.3d 388, 396 (8th Cir. 2016) (cleaned up and citation omitted). The United States Court of Appeals for the Eighth Circuit considers the following factors when determining whether an individual is in custody and entitled to receiving a Miranda warning:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990); Laws, 819 F.3d at 397. These factors, though useful, are not exclusive or exhaustive, and the ultimate inquiry remains whether the defendant was restrained as though under formal arrest. United States v. Carlson, 613 F.3d 813, 817 (8th Cir. 2010); United States v. Thomas, 664 F.3d 217, 222 (8th Cir. 2011).

Schnitker argues statements from both interviews were involuntary because he was not told he was free to leave, "answer[ed] questions without any warnings of how his statements could be used against him in a criminal prosecution," and was not told "he was being investigated for a criminal offense." Doc. 45 at 2. These arguments essentially claim that SA Moule's failure to provide Miranda or Griffin warnings made his statements involuntary. See Miranda, 384 U.S. at 467–69 (explaining a defendant must know of certain rights before a custodial interrogation); Griffin, 922 F.2d at 1349 (listing factors used in a custody determination).

This argument is unavailing because the circumstances of the interviews do not suggest Schnitker was in custody requiring warnings under Miranda or Griffin. For the October interview, Schnitker arrived at the Blue Earth County Government Center by himself and demonstrated "unrestrained freedom of movement during questioning" by freely exiting the room to use the bathroom and returning on his own. ST at 22–23; see also Griffin, 922 F.2d at 1349. Schnitker acknowledged the voluntariness of his attendance and participation at the end of the interview. Ex. 1a at 75. SA Moule indicated Schnitker was not in immediate trouble, and Schnitker was not arrested immediately after the interview. ST at 34, 69–71. The interview room door was unlocked, id. at 17; the tone of the interview was conversational, id. at 47; and the effect of police on the environment was minimal because the interview did not take place at a police station, id. at 14. SA Moule was in casual clothes, id. at 56; did not have a visible firearm, id. at 44; was comfortably seated multiple feet away from Schnitker, id. at 46; and was the only member of law enforcement present, see generally id. None of these facts suggest Schnitker was restrained as though under formal arrest or that he did not feel free to leave.

For the February interview, Schnitker freely arrived on his own. Id. at 53. SA Moule explained to Schnitker that the interview was voluntary and that he was not under arrest, though

8

he did not mention those circumstances at the start of the interview. Ex. 2a at 15; ST at 53, 57, 64–65; see also Griffin, 922 F.2d at 1349 (considering notice to a defendant of his freedom to leave or participate in the interview as relevant to a custody determination). The interview lasted approximately fifteen minutes and occurred in an open, unlocked interview room; Schnitker sat closest to the exit. ST at 54–55; see also Griffin, 922 F.2d at 1349 (indicating that "unrestrained freedom of movement during questioning" favors finding the defendant was not in custody). SA Moule sat approximately three feet away from Schnitker on the opposite side of a round table; he was in casual clothes but was armed. ST at 54–56. SA Moule confronted Schnitker about how his DNA taken from the buccal swabs matched DNA found in the alleged victim's underwear and explained they "need to talk about" it. Id. at 55, 66, 70; Ex. 2a at 7. Schnitker repeatedly denied sexual contact with the alleged victim and suggested she may have "had some sort of master plan" to obtain his semen from a used condom and transfer it to her own underwear. ST at 63; Ex. 2a at 7–9. As with the October interview, these facts do not suggest Schnitker reasonably felt unable to end the interview or was restrained as though under formal arrest.

For these reasons, the Griffin factors do not favor finding that Schnitker was in custody and thus SA Moule did not have to give additional Griffin or Miranda warnings to Schnitker before questioning him. The circumstances of the interviews were such that a reasonable person would believe he or she was free to leave and terminate the encounter. See Ferguson, 970 F.3d at 901 (explaining the standard for Miranda custody is "whether, given those circumstances [surrounding questioning], a reasonable person would have felt free to terminate the questioning and leave"). Accordingly, Schnitker's statements from both interviews were voluntary without Griffin or Miranda warnings.

**B. Voluntariness of Consent to Buccal Swabs**

Schnitker objects to the Report and Recommendation's conclusion that he voluntarily consented to a buccal swab sample of his DNA, specifically arguing that representations by Noska and SA Moule made his consent involuntary. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An intrusion into the body for buccal swabs constitutes a Fourth Amendment search. See Missouri v. McNeeley, 569 U.S. 141, 148 (2013); Maryland v. King, 569 U.S. 435, 446 (2013) (stating that "any intrusion into the human body" is an invasion "subject to constitutional scrutiny" (cleaned up and citations omitted)). As a rule, and subject to certain exceptions, the Fourth Amendment proscribes as unreasonable all warrantless searches and seizures. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). One such exception, however, is valid consent by the subject of the search. See United States v. Espinoza, 885 F.3d 516, 523 (8th Cir. 2018) ("A search conducted pursuant to a valid consent is constitutionally permissible." (citation omitted)). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002) (quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996)).

Consent must be voluntary to be valid. Valid consent means it is "freely and voluntarily given, and not the product of implicit or explicit coercion." United States v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008) (citation omitted). "The government bears the burden of proving voluntary consent." United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011) (citation omitted). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968) (citation omitted). "In each case, the question is one of mental awareness so that the act of consent was the consensual act of one who knew what he was

doing and had reasonable appreciation of the nature and significance of his actions." Castellanos, 518 F.3d at 969 (citation omitted). Yet, whether consent was voluntarily given does not turn on a defendant's subjective state of mind. Espinoza, 885 F.3d at 523. Rather, the issue turns on whether an "officer reasonably believed the defendant consented." Id. In evaluating whether an officer's belief was reasonable, a court must consider certain factors concerning the individual who allegedly consented to the search:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his or her] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010) (quoting United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009)). A court should also consider factors relating to the environment in which consent was obtained:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

United States v. Dunning, 666 F.3d 1158, 1165 (8th Cir. 2012) (quoting United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011)). Schnitker challenges the Report and Recommendation's finding that his consent to the buccal swabs was voluntary.

Considering the factors outlined in Golinveaux, Schnitker's own demeanor and appearance of comprehension suggest his consent was voluntary and that SA Moule was reasonable in believing it was voluntary. Schnitker was a 38-year-old man who appeared to be of average intelligence. ST at 23; Ex. 2a at 12. Nothing in the record suggests he was intoxicated or otherwise not of sound mind at the time of the interview. ST at 36. He was not read his Miranda rights, but

11

he was not in a custodial interrogation requiring SA Moule to do so. Schnitker also had prior encounters with law enforcement and the criminal justice system that could inform his understanding of the situation and of his legal protections. Ex. 1a at 72.

Applying the factors listed in Dunning, the atmosphere of the interview supports finding that Schnitker's consent, and SA Moule's interpretation of it, was voluntary. Schnitker was not detained when he consented to the search, and the interview during which SA Moule requested the buccal swabs only lasted approximately seventy-five minutes. See Ex. 1a. SA Moule did not use threats, intimidation, or coercion to extract consent, either; rather, SA Moule explained that Schnitker did not need to provide the buccal swabs and that it was voluntary, and Schnitker chose to provide a written consent and allow SA Moule to take the buccal swabs anyway. ST at 36, 47; Ex. 1a at 75. Schnitker was not arrested or otherwise in custody prior to, during, or immediately after the interview, and SA Moule emphasized that Schnitker was not in trouble. ST at 65, 69–71; Ex. 1a at 77–78. Noska was present at the interview and at the time of the search, which took place in a public government building. ST at 14; see also Ex. 1a at 80–81. Lastly, Schnitker did not object to or remain silent during the search; instead, he affirmatively consented in writing to and freely participated in the collection of the buccal swabs. See Ex. 1a 72–81.

For these reasons, the collection of the buccal swabs did not violate Schnitker's Fourth Amendment rights. Without coercion, threats, or intimidation, SA Moule asked for consent from Schnitker and was reasonable in believing that Schnitker's authorization to take the buccal swabs, especially after being expressly told it was voluntary, constituted valid consent.

### C. Fruit of the Poisonous Tree

Schnitker further argues the second interview, and the statements made therein, must be excluded as fruits of a violation of the Fourth Amendment. He asserts that, because the October

2021 statements and consent for the buccal swabs were given involuntarily and in violation of the Fourth Amendment, the DNA evidence and the February 2022 interview statements related to the October 2021 statements, buccal swabs, and subsequent DNA testing are subject to exclusion. See Wong Sun v. United States, 371 U.S. 471, 484–86 (1963) (indicating that evidence directly and indirectly obtained in violation of, or stemming from a violation of, the Constitution is excluded). Because this Court has decided the October 2021 statements and buccal swabs were not obtained in violation of the Fourth Amendment, this Court agrees with Judge Moreno that "there is no poisonous tree for any tainted fruit to grow or fall from," and any DNA evidence from the buccal swabs and statements related to them are not excludable under Wong Sun. See Doc. 54 at 8.

### III. Conclusion

For the reasons explained, it is

ORDERED that Defendant Ethan Schnitker's objections to the Reports and Recommendations, Docs. 45 and 55, are overruled and the Reports and Recommendations, Docs. 43 and 49, are adopted. It is further

ORDERED that Defendant Ethan Schnitker's Motion to Suppress, Doc. 19, and Supplement to Motion to Suppress, Doc. 44, are denied.

DATED this 3rd day of April, 2024.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE